# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-17-00104-CV

**M. C., Appellant**

**v.**

**Texas Department of Family & Protective Services, Appellee**

## FROM THE DISTRICT COURT OF HAYS COUNTY, 428TH JUDICIAL DISTRICT
## NO. 15-2494, HONORABLE WILLIAM HENRY, JUDGE PRESIDING

## M E M O R A N D U M   O P I N I O N

This is an appeal from a final order, following a bench trial, terminating the parental rights of M.C. to her one-year-old son, J.C. In a single issue on appeal, M.C. asserts that the evidence is legally and factually insufficient to support the district court's finding that termination of her parental rights was in the best interest of the child. We will affirm the district court's order.

## BACKGROUND

The Texas Department of Family and Protective Services (the Department) brought suit to terminate M.C.'s parental rights based on allegations that M.C. had, among other grounds for termination, endangered her child's well-being by engaging in criminal activity and associating with others who had engaged in criminal activity, including illegal drug use and domestic violence. The matter was initially heard by an associate judge, who recommended termination of M.C.'s parental

rights. M.C. then exercised her right to a de novo hearing before the district court,[1] during which a transcript of the proceedings before the associate judge was admitted into evidence and additional testimony was heard. The evidence considered by the district court, which we discuss in more detail below, included the testimony of M.C.; Amy Robles, a caseworker for Child Protective Services (CPS); B.V., the child's great-grandmother and current placement; and Jennifer Bevel, a licensed professional counselor who had provided counseling services to M.C. during the case. Following the hearing, the district court found by clear and convincing evidence that termination of the parent-child relationship was in the best interest of the child and that M.C. had committed the following statutory grounds for termination: (1) engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangered the physical or emotional well-being of the child; and (2) failed to comply with the provisions of a court order that specifically established the actions necessary for M.C. to obtain the return of the child. This appeal followed.

## STANDARD OF REVIEW

"Because the natural right between a parent and [her] child is one of constitutional dimensions, termination proceedings must be strictly scrutinized."[2] "In parental termination cases, due process requires application of the clear and convincing standard of proof."[3] Clear and convincing evidence is a heightened burden of proof that requires "the measure or degree of proof

---

[1] *See* Tex. Fam. Code § 201.015.

[2] *In re K.M.L.*, 443 S.W.3d 101, 112 (Tex. 2014) (citing *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985); *In re G.M.*, 596 S.W.2d 846, 846 (Tex. 1980)).

[3] *Id.* (citing *Santosky v. Kramer*, 455 U.S. 745, 769 (1982); *In re J.F.C.*, 96 S.W.3d 256, 263 (Tex. 2002)).

that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established."[4]  On appeal, we apply a standard of review that reflects this burden.[5]

"In a legal sufficiency review, a court should look at all the evidence in the light most favorable to the finding to determine whether a reasonable trier of fact could have formed a firm belief or conviction that its finding was true."[6]  "To give appropriate deference to the factfinder's conclusions and the role of a court conducting a legal sufficiency review, looking at the evidence in the light most favorable to the judgment means that a reviewing court must assume that the factfinder resolved disputed facts in favor of its finding if a reasonable factfinder could do so."[7]  "A corollary to this requirement is that a court should disregard all evidence that a reasonable factfinder could have disbelieved or found to have been incredible."[8]  However, "[t]his does not mean that a court must disregard all evidence that does not support the finding."[9]  The reviewing court must consider "undisputed facts that do not support the finding."[10]  "If, after conducting its legal sufficiency review of the record evidence, a court determines that no reasonable factfinder could

---

[4]  Tex. Fam. Code § 101.007; *see K.M.L.*, 443 S.W.3d at 112.

[5]  *See J.F.C.*, 96 S.W.3d at 264-66.

[6]  *Id*. at 266.

[7]  *Id*.

[8]  *Id*.

[9]  *Id*.

[10]  *Id*.

3

form a firm belief or conviction that the matter that must be proven is true, then that court must conclude that the evidence is legally insufficient."[11]

"[A] proper factual sufficiency review requires the court of appeals to determine whether 'the evidence is such that a factfinder could reasonably form a firm belief or conviction about the truth of the State's allegations.'"[12] "If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient."[13] "And in making this determination, the reviewing court must undertake 'an exacting review of the entire record with a healthy regard for the constitutional interests at stake.'"[14] However, "while parental rights are of a constitutional magnitude, they are not absolute."[15] "Consequently, despite the heightened standard of review," the reviewing court "must nevertheless still provide due deference to the decisions of the factfinder, who, having full opportunity to observe witness testimony first-hand, is the sole arbiter when assessing the credibility and demeanor of witnesses."[16]

---

[11] *Id*.

[12] *In re A.B.*, 437 S.W.3d 498, 502-03 (Tex. 2014) (quoting *In re C.H.*, 89 S.W.3d 17, 25 (Tex. 2002)).

[13] *J.F.C.*, 96 S.W.3d at 266.

[14] *A.B.*, 437 S.W.3d at 503 (quoting *C.H.*, 89 S.W.3d at 26).

[15] *Id*.

[16] *Id*. (citing *In re J.L.*, 163 S.W.3d 79, 86-87 (Tex. 2005)).

**ANALYSIS**

In her sole issue on appeal, M.C. asserts that the evidence is legally and factually insufficient to support the district court's finding that termination of her parental rights was in the best interest of J.C. When deciding the best-interest issue, we consider the well-established *Holley v. Adams* factors, which include the child's wishes, the child's emotional and physical needs now and in the future, emotional or physical danger to the child now and in the future, the parenting abilities of the party seeking custody, programs available to help that party, plans for the children by the party seeking custody, the stability of the proposed placement, the parent's conduct indicating that the parent-child relationship is improper, and any excuses for the parent's conduct.[17] The Department need not prove all of the *Holley* factors as a "condition precedent" to termination, and the absence of some factors does not bar the factfinder from finding by clear and convincing evidence that termination is in a child's best interest.[18] The need for permanence is the paramount consideration when determining the children's present and future physical and emotional needs.[19] Moreover, a parent's statutorily offensive conduct is often intertwined with the best-interest determination.[20]

---

[17] *See* 544 S.W.2d 367, 371-72 (Tex. 1976).

[18] *C.H.*, 89 S.W.3d at 27.

[19] *In re D.R.A.*, 374 S.W.3d 528, 533 (Tex. App.—Houston [14th Dist.] 2012, no pet.) (citing *Dupree v. Texas Dep't of Protective & Regulatory Servs.*, 907 S.W.2d 81, 87 (Tex. App.—Dallas 1995, no writ)).

[20] *Horvatich v. Texas Dep't of Protective & Regulatory Servs.*, 78 S.W.3d 594, 601 (Tex. App.—Austin 2002, no pet.) (citing *Holley*, 544 S.W.2d at 372; *Leal v. Texas Dep't of Protective & Regulatory Servs.*, 25 S.W.3d 315, 321 (Tex. App.—Austin 2000, no pet.)).

Here, the evidence considered by the district court on the best-interest issue included evidence tending to show that this case was not the first time that M.C. had been involved with the Department. M.C. testified that she had four children prior to J.C., all of whom had been the subject of prior CPS proceedings. According to M.C., CPS became involved with her first child after the child's "paternal great-grandmother called CPS on me and my family saying that my daughter was sleeping in a basket on the floor, and CPS showed up the day I was discharged from the hospital from giving birth." M.C. also claimed that CPS became involved with her next three children after M.C. "got in a verbal altercation" with her grandmother.[21] M.C. denied that CPS's involvement was due to more serious matters, such as drug issues or health concerns. M.C. acknowledged that she had voluntarily relinquished her parental rights to three of her other children, but she claimed that she "did that out of emotional distress" and did not believe that terminating her parental rights to those children had been in their best interest. M.C. similarly expressed the belief that terminating her rights to J.C. would not be in that child's best interest.

According to the Department's permanency report, a copy of which was admitted into evidence, the case involving J.C. began in October 2015, when law enforcement went to B.V.'s house, where M.C. was residing at the time, to execute an outstanding warrant for M.C. Deputy Ryan Gonzalez of the Hays County Sheriff's Office testified that while officers were at the residence, they encountered J.T., the father of J.C., who also had an outstanding warrant. Gonzalez testified that J.T. was arrested and placed in a patrol car but that he escaped from the patrol car and evaded

---

[21] The record does not reflect whether this was the same person who had earlier reported M.C. to CPS.

6

apprehension until the next day, when officers returned to the residence and found J.T. in M.C.'s bedroom, "lying in the bed covered in blankets." J.T. was again arrested, and M.C. was also arrested at that time for the offense of hindering apprehension of a fugitive. The Department subsequently took custody of J.C., who had been present at the residence when his parents were arrested.

J.C. was initially placed with M.C.'s mother, M.K. However, that placement ended after M.K. had allowed M.C. to have unsupervised access to J.C. while the case was ongoing. During a time when M.C. had access to the child, M.C. was again arrested, this time in a hotel room where drugs were found. Specifically, according to the Department's permanency report,

> [M.C.] was arrested in July 2016 with [J.C.] in her care. [M.C.] was called by law enforcement to report to a hotel room that was registered in her name. The hotel room was being investigated after a welfare check was completed and law enforcement found drugs in the room with an infant present and [an]other woman. [M.C.] stated that she had rented out the room for a friend she met; she stated she was not aware of the drugs. At this time, [M.C.] had [J.C.] unsupervised and was with a paramour the Department was not aware of. [M.C.] was arrested for outstanding warrants.

Subsequently, M.C. pleaded no contest to the offenses of hindering apprehension and public lewdness (an offense that predated the events of this case) and was placed on deferred-adjudication community supervision for 24 months for each offense. Copies of the deferred-adjudication orders were admitted into evidence.

The district court also considered evidence tending to show that M.C. had a history of mental illness. M.C. testified that at the time of the trial, she suffered from depression, bipolar disorder, post-traumatic stress disorder, anxiety, and multiple-personality disorder. When asked what steps she had taken to "address these disorders," M.C. testified, "I meditate every day. I do

7

yoga. I try to release endorphins so that I don't have to be on medication constantly." At the initial trial, M.C. testified that she did not take any medication for those illnesses, although she later testified at the de novo hearing that she was taking lithium to treat her depression. M.C. also admitted that she had "tried to harm herself" on one occasion.

Jennifer Bevel, a licensed professional counselor, had worked with M.C. during the case "on stress management and maintaining her sobriety." Bevel testified that M.C. had informed her that she had been diagnosed with bipolar disorder but that M.C. "is not currently on medication" for that illness because "she's not able to afford it." Bevel acknowledged that her counseling sessions with M.C. had not been "extensive" and were focused not on parenting skills but on "avoid[ing] temptation" from alcohol and "how [M.C.] manages her stress and taking care of herself, eating well and getting enough sleep at night."

M.C. admitted during her testimony that she had tested positive for cocaine and marihuana while this case was ongoing, although she denied using those drugs and claimed that the tests were wrong. M.C. also agreed with the Department's statement that she had admitted to Amy Robles, the CPS caseworker, that she was "around people who smoke marihuana all the time." M.C. explained, "I was homeless for the majority of this case, and I was staying with people that weren't savory. That's why I was staying in and out of hotels because even though I couldn't afford it, I would rather max out my credit cards than stay in an environment that I could not handle." M.C. added, "I slept in people's cars, and I couched [at M.K.'s house] for a while. I stayed in hotels when I had money."

Most recently, M.C. lived with Imra Khan, her fiancé at the time of the initial trial and her husband at the time of the de novo hearing. M.C. testified that Khan had mental-health issues similar to her own, including symptoms of anxiety, depression, and bipolar disorder. Additionally, Khan testified that he was charged in 2009 with the offenses of aggravated robbery and assault causing bodily injury to a family member, and had served five years' imprisonment for the aggravated-robbery offense. When asked how she felt "knowing that your fiancé has something in his background potentially that involves domestic violence, and you want to take your son home to that residence where he is the primary provider," M.C. testified, "Everybody has a past. I have a past. I'm not a bad mother." M.C. also testified that she had been in other relationships where domestic violence had been an issue, and she acknowledged that two of the fathers of her children were currently in prison, with one having been convicted of murder.

Khan further testified that he was charged in 2016 for the offenses of possession of marihuana and possession of a controlled substance, specifically cocaine. Khan claimed that he did not use drugs with M.C. and that M.C. had never seen him use drugs because, according to Khan, "I hide that from her." M.C. testified that, although she was initially concerned with Khan's cocaine use, it did not currently concern her and that she planned to "[e]ventually" leave J.C. in Khan's care while she was at work, after Khan had completed a drug-rehabilitation program. Until then, M.C. explained, she would have other family members take care of J.C., including her grandmother, mother-in-law, and sisters-in-law.

M.C. also testified to her perception that her home was ready for J.C.'s return. She explained, "I have baby proofed it. I coupon, so he has a stockpile of diapers that when my grandma

9

needs them she'll call and ask if she can pick up some Pampers or food and stuff like that. He has his playpen set up. He has a play corner that I have set up for him." M.C. added that she also had a crib for J.C. set up in her bedroom.

J.C. was currently placed with B.V., his great-grandmother and M.C.'s grandmother, who also had custody of three of M.C.'s other children. B.V. testified that she wanted to adopt J.C. and also intended to adopt two of his siblings. When asked how the children were doing at her home, B.V. testified, "Very good." She added that J.C. was "very happy" and interacts with his siblings well. According to B.V., "He plays with them, and he loves the attention and they give him a lot of attention." B.V. also testified that one of the reasons that she took care of the children was because she did not "want them in foster care. I want them together. I want them raised together." However, when she was asked whether she believed that it would be "best" for J.C. if M.C.'s parental rights were terminated, B.V. did not provide a direct answer. Instead, she testified as follows:

> It's hard. It is hard for me to explain something like that because I know that, like I said, she is a good mother. When she is on her medications, she does everything, but honestly you just can't tear a child away from his mother. She's already had three taken away from her even though, you know—and I know it's hard for her, and I feel for her, but I don't know how to explain this.

Amy Robles, the CPS caseworker assigned to this case, testified that J.C. was doing "wonderful" in his current placement and that he was a "very, very healthy little boy" who was "happy" and "bonded to his placement." When asked if she had "any concerns about the care [J.C.] was receiving from [B.V.]," Robles testified, "None." Robles also testified that B.V. was "a great

mom. She's hands on, very attentive. She makes sure every—all of his needs are met. He's always well dressed. He's doing very, very well." She added that B.V. was "very good with all of the children. She has a lot of patience, and just I commend her on her ability to have that many kids." When asked if she had concerns "about the number of children in [B.V.]'s home," Robles testified, "I don't have any concerns because she has a tight family and they're all very supportive, so everyone helps everyone out. And you can tell that they're a very loving family, so there really isn't any—there doesn't seem to be any conflict or anything, so they're just very helpful with one another." At the de novo hearing, Robles provided additional testimony as to J.C.'s current placement. She testified that the home was a "very safe place" and that J.C. had lived there for "the "majority of his young life." Robles also testified that "[J.C.] and his siblings are extremely bonded; they play well together. He's happy. He's very healthy. He's just—he's thriving. He's doing extremely well. He's—he's just a happy, well-rounded little boy."

Robles further testified that M.C.'s behavior continued to cause her concern. Specifically, Robles explained, M.C. "is around people that are using drugs, and we don't know what's going on because she is not being truthful about her drug use." Robles added, "[S]he hasn't had a stable housing situation. . . . It's just been very unstable for lack of a better word." Robles's other concerns included M.C.'s "choice in men," her "continuing relationships that are not healthy," and her "mental health . . . not taking medication to assist with her diagnosis." At the de novo hearing, Robles also testified that M.C. "was very angry most of the time. She had no—no filter. . . . [W]hen we had conversations face-to-face she—she could not control her anger, and it was basically demonstrating to me that she did not learn anything from her anger management" class.

11

Robles added that M.C. "was not successful in her completion" of individual therapy and had failed to follow up with her doctor regarding mental health recommendations and treatments.

In summary, the undisputed evidence tended to show that M.C.: (1) had a history of engaging in criminal activity; (2) had ongoing mental-health issues and had failed to follow the recommendations of her doctor to treat those issues; (3) had tested positive for illegal drug use while the case was ongoing and had admitted that she was "around people who smoke marihuana all the time"; (4) had been in relationships with men, including her current husband, who had engaged in domestic violence, illegal drug use, and other criminal activities; and (5) had a history of unstable living arrangements, including, by M.C.'s own admission, being homeless "for the majority of this case." The undisputed evidence also tended to show that J.C., in his current placement, was healthy, happy, loved, and bonded with his siblings. Viewing the above and other evidence in the light most favorable to the district court's finding, we conclude that the evidence is legally sufficient to prove that termination of M.C.'s parental rights was in the best interest of the child.

After giving due consideration to the disputed evidence in the case, we reach the same conclusion regarding the factual sufficiency of the evidence. The disputed evidence consisted of M.C.'s claim that terminating her parental rights was not in the best interest of J.C., M.C.'s denial that she was using drugs while the case was ongoing (despite acknowledging the positive drug tests), and B.V.'s testimony as to what she believed to be in the child's best interest, including her claim that, "[w]hen she is on her medications," M.C. is "a very good mother." However, the district court, as factfinder, was free to disbelieve M.C.'s self-serving claims and to view B.V.'s testimony commending the parenting abilities of her granddaughter with skepticism, particularly in light of

12

M.C.'s prior history with CPS, Robles's extensive testimony detailing her ongoing concerns with M.C.'s behavior, and M.C.'s own testimony in which she acknowledged her untreated mental-health issues, past homelessness, and relationships with violent men. In light of the entire record, we cannot say that the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction that termination of M.C.'s parental rights was in the best interest of the child.

We overrule M.C.'s sole issue.

## CONCLUSION

We affirm the district court's termination order.

_____

Bob Pemberton, Justice

Before Justices Puryear, Pemberton, and Goodwin

Affirmed

Filed: August 1, 2017